## Coomes Brothers v. Grigsby & Company, et al.

(Decided December 20, 1912.)

### Appeal from Nelson Circuit Court.

Finding of Chancellor—On Question of Fact—Not Treated as Verdict of Properly Instructed Jury.—The chancellor's judgment on a question of fact will be given some weight, but it is not treated as the verdict of a properly instructed jury; and will be reversed if against the weight of the evidence.

NAT W. HALSTEAD, E. E. McKAY and S. W. ESKEW for appellants.

C. T. ATKINSON and J. SMITH BARLOW for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE HOBSON—Reversing.

The firm of Coomes Brothers made an assignment on November 10, 1910, to W. T. Spalding for the benefit of their creditors. The firm was composed of three brothers—Bowman, William and Floyd Coomes, the latter being an infant. At the time of the assignment, the firm owed Grigsby and Company a debt of about $500 which was unsecured. Grigsby and Company brought this action against the Coomes Brothers, their mother, Annie E. Coomes, and the assignee, W. T. Spalding, charging in their petition that the firm owned two mules worth $325 and ten hogs worth $94.95, which they had not included in their schedule or turned over to the assignee, and had fraudulently turned over to their mother, Annie E.

Coomes. Answers were filed controverting the allegations of the petition and on final hearing the circuit court adjudged the plaintiff the relief sought in their petition, directing the assignee to take charge of the property and hold it for the benefit of the creditors of Coomes Brothers. From this judgment the mother, Annie E. Coomes, and Coomes Brothers appeal.

Jeff D. Coomes the father of the Coomes Brothers and the husband of Annie E. Coomes died in the spring of the year 1910, largely indebted. After his death the exemptions allowed to the widow and the infant children under the statute were set apart. There were six boys and two girls, and as we understand the evidence, only two of the boys were of age. Bowman, William and Floyd were cultivating a farm which they had rented and on which they lived not far from their father's and were also doing business as Coomes Brothers in bailing hay and the like. The father had bought his farm but he had not paid for it, and the widow and the infant children remained on this. The proof for the defendants by Mrs. Coomes and her sons is in effect that she desired to put in a considerable crop of wheat on the farm, and not having team enough to put the crop in, desired to buy two mules to be used in putting in the wheat crop; that she had her two sons to buy the two mules for her, they and she executing the note for the purchase money. The mules were brought to her place, and used in putting in the wheat crop by the younger boys, and were kept on her place. They were never used by Coomes Brothers, and were in her possession at the time of the assignment. C. R. Barnes from whom they bought the mules stated practically the same facts as they do as to what the trade was, testifying that they told him their mother was purchasing the mules and that they asked permission to take the mules to her place so that she might see them before the trade was concluded.

The proof as to the hogs by the defendants is that Mrs. Coomes at the suggestion of her sons concluded in August that she ought to get some hogs to make her meat for another year; that Coomes Brothers owed her about $40, and at her suggestion one of them bought the ten hogs from a neighbor paying thereon $44, and agreeing to pay the balance, $50. Her son testifies that he told the person from whom he bought the hogs that they were for his mother. He testifies that nothing of the sort was said. The remainder of the price of the hogs was not

paid or secured until after the assignment when Mrs. Coomes and W. T. Spalding, as her surety, gave her note for it. The hogs like the mules were taken to Mrs. Coomes' place and were there in her possession from the time of her purchase until this controversy arose.

On the other hand the plaintiff proved by two witnesses that on the day of the assignment, the elder Grigsby asked C. R. Barnes if the Coomes Brothers owed him anything, and Barnes said they owed him a note for $325 for a pair of mules; that he was safe as he had their mother on the note as security. Barnes says that he said, "I sold them a pair of mules out there a few weeks ago but look to Mrs. Coomes for that; Mr. Grigsby asked me if she was on the note and I said yes." He also testifies that a day or two after this when Grigsby called his attention to the mules not being in the schedule, he said, "Well, I suppose not because they said they bought them for their mother, and wouldn't suppose they would list them as a part of their assets." Frank Coomes testified that he had a talk with the Coomes Brothers about the pair of mules, and asked them what they gave for them, and they said $325, and he asked them why they were not working them, and they said they didn't care to butcher them, they were young mules. P. B. Crume, the man from whom the hogs were bought also testified that at or about the time of the assignment, some of the Coomes brothers had a conversation with him in which they said, if he said nothing about them buying the hogs from him, that nobody would know they had bought them, and they would turn the hogs over to their mother, or give them to their mother; that they said the hogs wouldn't have to go into the assignment. He also testified that when he went over to see about the hogs after the assignment they claimed that the hogs were bought for their mother, and that she said that they hadn't fulfilled their contract by giving him the note, and whatever the boys did about the hogs would be all right with her. He was then proposing to take back part of the hogs in as much as he hadn't been paid all the purchase money. He also testified that in speaking about the mules, Mrs. Coomes said she thought they would be thrown into the assignment; she referred to them in that way while she seemed to think the mules ought to belong to her. "She said, I expect the mules will have to go into the assignment; and that the mules were bought for her, and why they would have to go in I don't know." R. W. Havelan

testified that he had a conversation with William or Bowman Coomes on the day of the administrator's sale of his father's property, and that he said if there was a crowd enough there he was going to sell his mules, and that after the sale he told him there were no mule buyers there, and he didn't sell any mules.

This is in substance the evidence heard on the trial. We think it is totally insufficient to show that the mules or hogs were the property of Coomes Brothers or were fraudulently transferred to their mother by them. The testimony as to what Barnes said about the mules is only competent to contradict his testimony and his testimony is confirmed by the testimony of Mrs. Coomes and her two sons and a number of circumstances. That Mrs. Coomes in fact used the mules and that she claimed them as her mules long before there was any idea of an assignment, is proved by a witness who lived on the place. The statements of Coomes Brothers shown by the plaintiffs are at best very uncertain evidence and when all the facts and circumstances are considered, the great weight of the evidence is in favor of Mrs. Coomes. It is undoubtedly true that both Mrs. Coomes and her sons, not knowing the law applicable or their rights under the law, were in doubt where they stood after the assignment was made, and that their ignorance and apprehension led them to say the things that were proved by the plaintiffs. But these utterances are not sufficient to overcome the undoubted fact that both the hogs and the mules were taken to Mrs. Coomes' place when they were bought and put in her possession and kept in her possession and control; that she needed them and so far as the evidence shows, the boys did not need them. It was not unnatural that the mother so lately widowed should have her boys do the trading for her, and it was not unnatural that they should speak of the property as the mules and the hogs they had bought. The evidence as to the hogs is not as clear as that as to the mules, but summing it all up we are satisfied the transaction was in good faith and was not made with any view of defrauding or affecting in any way the creditors of Coomes Brothers. At that time they were doing considerable business, and no thought of assignment was in their minds.

It is true that in an equity case we give considerable weight to the finding of the chancellor on a question of fact, and that we will not reverse his judgment on a mere question of the credibility of the witnesses where the

evidence is conflicting. But as we have held in many cases, we read the record for ourselves and when on the face of the record, the chancellor's judgment is not supported by the weight of the evidence, it will not be affirmed. (Deatley v. Tolle, 96 S. W., 920; Howell v. Union Grocery Co., 113 S. W., 912; Northrups v. Summers, 132 Ky., 156; Sommers v. Ross, 116 S. W., 1181; Quigley v. Beam, 137 Ky., 325; Prewitt v. Glasscock, 137 Ky., 580; Fairbanks, Morse & Co. v. Madisonville Savings Bank, 141 Ky., 374.)

The verdict of a properly instructed jury will not be disturbed unless it is palpably against the evidence. The judgment of the chancellor is given considerable weight but it is not treated as the verdict of a properly instructed jury for the reason that he does not see and hear the witnesses and must simply determine the case from the record, and when his judgment is not in accord with the weight of the evidence, it will be reversed.

Judgment reversed and cause remanded for a judgment dismissing the petition.