## Farmer, et al. v. Hampton, et al.

(Decided May 27, 1913.)

### Appeal from Knox Circuit Court.

1. Homestead—Value—Action to Partition—Evidence.—In an action by the children of an intestate against his widow to partition his lands claimed by her as a homestead, evidence examined and held insufficient to sustain the finding of the chancellor that the lands were worth more than $1,000.

2. Homestead—Lands Included.—A tract of land distant from the home place about 300 yards which is used and cultivated by the owner in connection with his home place is included within his homestead where it, together with his other lands, did not exceed $1,000 in value.

3. Homestead—Forfeiture—Adultery of Wife—Section 2133, Ky. Stats.—In an action by the children of an intestate to recover and partition his lands on the ground that his widow by living in adultery had forfeited her homestead therein, evidence examined and held insufficient to sustain the charge of adultery.

HIRAM H. OWENS, JAS. D. BLACK, B. B. GOLDEN and PIT-ZER D. BLACK for appellants.

J. D. TUGGLE for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

W. H. Hampton was twice married. By his first wife he had three children, J. W. Hampton, Eliza S. Potter and Missouri Miles. Some time after the death of his first wife he married Charity Williams. By her he had eight children. Six of these children and one grandchild survived him. At the time of his death, in the year 1903, W. H. Hampton owned four tracts of land. He resided on a tract containing about fifty-six acres, and owned two adjoining tracts, one of eleven acres and one of six acres. He also owned a tract of thirty-five of forty acres, distant about 250 or 300 yards. After the death of W. H. Hampton, his widow, Charity, married James Farmer. Ever since his death his widow and certain of his children have occupied and cultivated the lands which he owned.

This action was brought by the stepchildren and children of Charity Farmer to partition the lands of which their father died seized. The action is based on the fact that the lands were worth more than $1,000, and on the further fact that Charity Farmer had forfeited her dower and homestead under section 2133 of the Kentucky Statutes by living in adultry prior to her husband's death. During the progress of the action Simeon Hampton died, unmarried, intestate and without issue. Charity Farmer pleaded that she had inherited his interest. On final hearing the court entered judgment, finding (1) that the land in controversy was of greater value than $1,000; (2) that the tract of land which did not adjoin the home place was not the subject of homestead. (3) that the defendant, Charity Farmer, had been guilty of adultery and was not entitled to a homestead; (4) that she had caused her infant children to leave home and seek shelter and employment elsewhere; (5) that the land be divided among the plaintiffs. From that judgment this appeal is prosecuted.

On the question of value, plaintiff J. W. Hampton, a miner by trade, who had never owned any land nor ever bought or sold any, testified that if the home place had been his when his father died he would not have taken

less than $1,000 for it. He also said that the tract of thirty-five or forty acres ought to have been worth four or five hundred dollars when his father died. James Detherage testified that he had owned six acres of land in that community, for which he paid $100; that after putting a small building on it he sold it for $150. He said that all the land W. H. Hampton owned at his death was worth $1,500. J. C. Sproul testified that he lived in the Swan Pond community twenty-five years ago, and he thought the land was worth from twelve to fifteen hundred dollars. He further said that a big portion of the land was very steep and for farming purposes he did not suppose it would be worth more than $1,000. S. P. Ely testified that he did not know what the land was worth, and would give no estimate. William Marcum, who owned no real estate, but who lived about three miles from the land in question, testified that he had owned at one time fourteen acres of land, upon which he drilled a well and built a house and then sold for $300. He fixes the valuation of the land in controversy at $1,500. On the other hand, Charley West, who owned land about one mile from the Hampton land, fixed the fair cash value of the land at the time of Hampton's death at $1,-000. He didn't believe it would sell at public sale for more than $1,000. Mr. Smith, who lived about a mile from the land, and owned 75 or 80 acres of land, fixed the value of the land at $1,000. Luke Hampton, who had known the land from childhood, and who was raised on the farm, and who bought and sold land in the community, and who was a brother of W. H. Hampton, says that he sold his interest in the upper piece for $175 and his mother paid W. H. Hampton $25. In his judgment all the land his brother owned at the time of his death was not worth over $1,000. G. P. Bain, a real estate agent at Barbourville, placed the value of the land at not over $800. J. D. Stanfill fixed the value of the land at $10 per acre. John Hampton, who lived on Swan Pond, testified that the land was very steep and rough, and in his opinion was not worth over $1,000. H. T. Lambert, who owned a farm on the creek, valued the land at from five to six hundred dollars.

Upon the question of Charity Farmer's adultery it appears that about four years after her husband's death she had a son by James Farmer. Three or four witnesses testified that during W. H. Hampton's lifetime

James Farmer occasionally worked for Hampton. He was frequently around there about Hampton's house, both when Hampton was there and away. He visited just like any neighbor would and sat around and talked. It further appears that James Farmer's wife was an invalid and was jealous of him. Charity Farmer testified that prior to her husband's death she had never had any improper relations with James Farmer or any one else. The child begotten by James Farmer was born four years after her husband's death. She subsequently married James Farmer.

As to her driving her infant children away it appears that just before she married James Farmer she told her boy Simeon, who was twenty-one years of age at the time, that he would have to get a new home. After that he left, but occasionally returned to his home. The next oldest son, Nathan Hampton, said that he left home to live with his grandfather; after that he went to live with J. W. Hampton and paid his board; that his mother had frequently tried to get him to stay at home; his mother treated him kindly; his mother would often beg him not to stay in the mines. George Hampton, a boy sixteen years of age, testified that before his mother married James Farmer she told Simeon he could go away if he wanted to, but that Simeon stayed. He himself went to work for Mack Potter, but came home on Saturday nights. His mother did his washing. The older children all stayed at their mother's house until they were married and set up homes for themselves. Charity Farmer testified that she always treated her children kindly; that when Simeon talked of going away she told him he could go if he wanted to; that Nathan and George frequently returned to her home when they were not at work. Simeon was twenty-one at the time the suit was brought. Need and Joe, aged 13 and 7 years, were living with her at the time she testified.

While it is the rule not to disturb the finding of the chancellor on a question of fact where the evidence is conflicting and upon a consideration of the whole record the mind is left in doubt, yet where it is apparent from the record that the chancellor's judgment is not supported by the weight of the evidence, it will not be affirmed. Coomes Bros. v. Grigsby & Co., 151 Ky., 394. While there is some evidence on the part of plaintiffs to the effect that the land of which W. H. Hampton died seized was worth more than $1,000 at the time of his

death, yet the decided weight of the evidence of those who were qualified to pass an opinion on the question, is to the effect that the value of the land at that time did not exceed $1,000. It appears from the record that W. H. Hampton bought the upper tract of 35 or 40 acres and his mother had a life estate therein. For a while he rented it from her, but she died in May and he died the following September. Upon her death a complete title vested in him and he used and cultivated the place in connection with his home farm after his mother died. It is not material that the upper place did not adjoin his home farm, or that W. H. Hampton did not live upon it, if, as a matter of fact, it was used ánd cultivated by him in connection with the place on which he lived and was a part of his homestead, and this tract with the home tracts was not worth more than $1,000. Gaar Scott & Co. v. Reazor, 28 Ky. Law Rep., 1308; Turner v. Brown's Admr., 128 Ky., 79. As the evidence fails to show that all of the land of which W. H. Hampton died seized was worth more than $1,000, and as it is apparent from the record that all of his land was used and cultivated by him as a homestead, it follows that Charity Farmer was entitled to a homestead therein unless guilty of some act depriving her of that right.

Plaintiffs insist that Charity Farmer forfeited her right of homestead by living in adultery with James Farmer prior to her husband's death. It is true that she gave birth to a child by James Farmer four years after her husband died. Aside from this fact, however, none of the witnesses testified to any facts from which it could be reasonably inferred that she had improper relations with James Farmer during the lifetime of her husband. Some two or three witnesses say that they saw James Farmer there on several occasions, both when W. H. Hampton was at home and not at home. They simply say that they saw him sitting around talking. None of the witnesses claimed to have seen him in a compromising position with Charity Farmer, or to have heard any conversation between them or to have witnessed any conduct that would justify the inference that their relations at that time were improper. While adultery may be proved by circumstances, and may be inferred from the conduct of the parties, yet the circumstances and conduct of the parties must be such as to make the inference not only probable, but reasonably certain. It may be doubted if the evidence in this case is

sufficient even to excite suspicion, much less to establish the fact of adultery. We, therefore, conclude that the chancellor erred in finding that Charity Farmer had been guilty of adultery during the lifetime of W. H. Hampton.

We do not understand exactly what effect the chancellor intended by his finding of fact that Charity Farmer had caused her children to leave her home and seek shelter and employment elsewhere. We deem it sufficient to say that the evidence fails to support this finding. Some of the older children married and left to establish homes of their own. The older boys while living elsewhere always regarded her home as their home. When they wished to return they were permitted to do so and she waited on them, did their washing and attended to their other needs just as she did for the other children. The two youngest children are still with her and appear to be satisfied with their home. The homestead is for her benefit as well as that of the infant children. If the children are denied this right, the court will protect their interest.

Judgment reversed and cause remanded, with directions to dismiss the petition. .